**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **RICHARD ALFORD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 07 C 4528** |
| | ) | |
| **KENDALL COUNTY DEPARTMENT** | ) | |
| **OF HEALTH,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

Richard Alford has sued the Kendall County Department of Health (the

Department), asserting claims for gender discrimination under Title VII of the Civil

Rights Act of 1964 (Title VII), unlawful retaliation under Title VII, and intentional infliction

of emotional distress (IIED).  The Department has moved for summary judgment on all

of Alford's claims.  For the following reasons, the Court grants the motion.

**Facts**

Because the Department has moved for summary judgment, the Court views the

facts in the light most favorable to Alford and draws reasonable inferences in his favor.

*See, e.g.*, *Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th

Cir. 2008).

Alford is a male who was employed as a clinical psychologist at the Department

from April 1999 until October 2006.  From 1999 until the end of 2002, Alford was

1

directly supervised by Cheryl Johnson, a female, who was the Department's executive

director.  From that point until August 2005, Terri Lee Dalton, a female, directly

supervised Alford.  Starting on August 22, 2005, Alford was directly supervised by

Jason Andrade, a male, until his termination.  During that period, Shelly Franklin, a

female, also had some supervisory responsibilities over Alford.  Franklin and Andrade

were in turn supervised by Amaal Tokars, a female, who reported directly to Johnson.

Alford does not contend that either Dalton or Andrade discriminated against him based

on his gender.  Instead, as detailed below, most of his allegations are directed at

Johnson.[1]

## 1.    Alford's job performance and termination

The Department claims that it terminated Alford based on disciplinary and

performance problems occurring between December 2005 and September 2006.

Those problems allegedly affected Alford's job performance.

A March 2006 performance evaluation did not explicitly list any of the incidents

prior to that date that the Department now states were the basis for Alford's termination.

A jury reasonably could infer that failure to mention those incidents meant that they

were insignificant.  Accordingly, for purposes of the Department's motion, the Court only

considers the Department's stated reasons for Alford's termination postdating March

2006.

---

[1]In response to the Department's statement of facts, Alford says that others told
him that Franklin made comments that were "discriminatory against men."  Pl.'s Resp.
to Def.'s Statement of Facts ¶ 5.  Alford cites only his own deposition testimony in
support of this claim and never states who told him about Franklin's alleged comments
or the substance of them.  The contention thus lacks a proper evidentiary foundation.

During the summer of 2006, Franklin and another female supervisor, Rae Ann VanGundy, conducted an audit of the Department's mental health files. Department policy required that the files contain treatment plans signed by both the patient and the treating clinician. Alford's files were missing some treatment plans, and others were unsigned. Alford does not deny these findings; rather, he contends that he had a better record of client signatures on treatment plans than other Department employees, including female clinicians. He has not, however, identified which employees he claims had a worse record than him. Alford also cannot recall whose files he reviewed to support his contention.

On July 27, 2006, the Department claims that Alford left work approximately ten to fifteen minutes before his shift ended and discussed leaving early with other employees. Alford claims that he was only joking with other employees about leaving early and that he clocked out but did not leave the Department's facility until after his scheduled shift ended. That evening, a supervisor (not Alford's supervisor), Michelle Hawley, was in charge of the Department's facility. Hawley reported to Tokars that Alford tried "to bully and intimidate her" about leaving early. Def.'s Statement of Material Facts ¶ 33. Alford denies bullying or intimidating Hawley. These issues were subsequently discussed at a meeting attended by Alford, Johnson, Tokars, and Andrade on August 10, 2006. At that meeting, Alford continued to deny that he had done anything improper. Johnson placed Alford on probation for six months following the meeting.

Also in July and August 2006, a dispute arose between Alford and others at the Department concerning fitness for duty evaluations performed by Department

3

employees for local law enforcement agencies.  The Department intended to add new components to the standard evaluation and change who would be performing certain portions of it.  Alford disagreed with these changes on a professional basis, calling them inappropriate.  Alford also felt that the local law enforcement agencies with which he had worked for a number of years, both before and during his employment with the Department, would be dissatisfied with the changes.

After being informed that the Department would use the new fitness for duty evaluation, Alford contacted the Chief of the Yorkville Police Department directly and scheduled an appointment to conduct a fitness for duty evaluation outside the Department using the old methodology.  Alford scheduled the evaluation without the Department's knowledge or permission.  The parties disagree, however, whether this was done in violation of Department policies and procedures.  Andrade called Alford on the morning of the evaluation to discuss the incident.  Alford stated that the police department was his private client, he was conducting the evaluation on his own time, and that Tokars "was attempting to usurp Alford and take away the Yorkville Police Department from him."  Pl.'s Resp. to Def.'s Statement of Facts ¶ 49.  This issue was also discussed at the August 10, 2006 meeting that included Alford, Johnson, Tokars, and Andrade.

On September 20, 2006, Alford did not show up for work at his regular time.  The parties dispute whether Alford had properly scheduled time off for that morning.

Based on this series of events (plus earlier ones the Court has not considered as noted above), Andrade recommended that Johnson and Tokars terminate Alford's employment, though Alford contends that the decision was solely Johnson's.  Johnson

agreed with the recommendation and made the ultimate decision to terminate Alford. On October 2, 2006, Alford was informed of his termination.

**2.      Allegations of discriminatory conduct**

Alford maintains that he was terminated because of his gender, not his job performance or disciplinary issues.  To support that claim, he points to several specific incidents as well as general allegations about the environment at the Department.

Alford first relies extensively on Dalton's deposition testimony for evidence of gender discrimination.  Dalton, however, identified only one specific comment of this nature – in January 2005, Johnson allegedly yelled at Alford that "just because you're a man . . . you're not going to get away with this."  Pl.'s Statement of Additional Facts ¶ 5. Though Alford made other complaints to Dalton regarding Johnson, Dalton stated that those complaints were not "in the context of sexual harassment, no.  Just that [Alford] didn't feel he was treated respectfully by [Johnson]."  Def.'s Resp. to Pl.'s Statement of Additional Facts ¶ 4.  Dalton heard Johnson refer to men as "macho" on one occasion. Dalton also stated that Johnson "seemed to have a difficult time" with "the male staff." Def.'s Resp. to Pl.'s Statement of Additional Facts Dalton Dep. at 41-42.  Alford has not submitted any evidence regarding his complaints to Dalton other than Dalton's deposition testimony.  According to Dalton, however, Johnson yelled at both male and female employees.  Dalton left the Department in August 2005, approximately fourteen months before Alford was terminated.

Alford also relies on the testimony of another Department employee, William White.  White worked as a full-time employee handling resources and referrals at the Department starting in July 2005.  White claims that he was instructed by VanGundy to

document problems with Alford.  White also claims that Department employees frequently left work early and that "it was 'common knowledge' that female employees were treated differently, more leniently, than male employees," describing this as "the spirit of the place."  Def.'s Resp. to Pl.'s Statement of Additional Facts ¶¶ 18, 20.  White could not, however, identify any specific instance when this occurred, and no foundation is provided for his purported knowledge.  White also claims that he was disciplined for making a sexual remark on one occasion but a female employee was not.  Finally, shortly after Alford was terminated, White applied for a promotion that he did not receive.  The successful applicant was female.  White claims that Tokars told him that Franklin had been looking for a female to fill that position.  The Department claims that White did not receive the position because he was not bilingual, unlike the successful applicant.

Alford presented several additional instances of allegedly discriminatory conduct.  In 2004, Alford contends Johnson said she would not allow a black man to go to a white woman's house on her watch.  With respect to the incident in July 2006 when Alford allegedly left work early, there is some evidence that Hawley may also have left early the same evening, even though only Alford was disciplined for doing so.  Finally, Alford was replaced by a female psychologist, though his former position is no a longer full-time position.  Alford had more clinical experience than the woman who replaced him.

**3.    Complaints regarding Johnson and the atmosphere at the Department**

Alford contends that he raised the alleged discriminatory conduct in the Department with supervisory figures on several occasions.  First, Alford states that he "complained to Dalton about sexual harassment/gender discrimination" and that

"Johnson was making discriminatory comments based on gender to him." Pl.'s Statement of Additional Facts ¶ 4. As detailed above, however, Alford only made one specific complaint to Dalton, approximately nineteen months before he was fired, regarding gender discrimination; the rest of his complaints to Dalton were framed in terms of lack of respect from Johnson. Dalton spoke with Johnson about this incident and Alford's concerns.

Next, Alford claims that he complained to Andrade that he felt the discipline he received was discriminatory. Alford elaborated that "when these disciplinary events would occur, I would ask [Andrade] what's up with this? What's going on? Like, you know, where is this coming from? What's happening with it? He would come in my office and act like, you know, personable and buddy." Pl.'s Resp. to Def.'s Statement of Facts ¶ 62. When asked what discriminatory events he reported to Andrade, Alford stated "[t]he discipline, what was going on with it, what is behind this, why kinds of things are happening because it just seemed like different things were happening. It was unusual. It seemed like something -- some agenda was going on, and I would try to ask him what's up, what going on. . . ." Pl.'s Resp. to Def.'s Statement of Facts Ex. 1 at 364. Alford has provided no further detail regarding complaints he made to Andrade, and nothing in the evidence Alford has submitted suggests he linked his complaints to his gender.

In 2005 or early 2006, Alford spoke with Kendall County Board member Pam Parr regarding the "climate and what was going on" at the Department. Pl.'s Resp. to Def.'s Statement of Facts Ex. 1 at 346. Though Alford claims he spoke to Parr about discrimination, he cannot recall if he specifically said that he himself had been the

victim of discrimination. Alford cannot remember the specifics of his conversation with Parr; he says he spoke generally about a "hostile work environment" and "people being harassed." *Id.* at 346-48. Alford does not say he told Parr about gender discrimination specifically, though he recalls complaining "[a]bout some of the discrimination." *Id.* at 345-36. In short, none of Alford's evidence links his complaints to Parr to his gender. Alford acknowledged that one of the victims of harassment that he had in mind when he spoke with Parr was a female employee, Bonnie Estenson. Alford has produced no evidence, nor has he contended, that his complaints to Parr were relayed to Johnson or anyone else at the Department.

Parr and Alford met a second time in spring or early summer of 2006. At that meeting, Alford says, he informed Parr that he "and others were being discriminated against." Pl.'s Resp. to Def.'s Statement of Facts Ex. 4 ¶¶ 8-10. Again, however, Alford submits no evidence concerning the nature of the alleged discrimination and whether Parr informed Johnson or anyone else at the Department of this conversation.

### Discussion

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). To determine whether a genuine issue of material fact exists, the Court must view the record in the light most favorable to the nonmoving party and draw reasonable inferences in that party's favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986); *Lesch v. Crown Cork & Seal Co.*, 282 F.3d

467, 471 (7th Cir. 2002).  A genuine issue of triable fact exists only if "the evidence is

such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*,

477 U.S. at 248.

## 1.     Employment termination

Alford alleges he was fired on the basis of his gender.  Claims for discrimination

under Title VII "may be proved either directly . . . or indirectly under the burden-shifting

method established in *McDonnell Douglas*."  *Scaife v. Cook County*, 446 F.3d 735, 739

(7th Cir. 2006) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04

(1973)).  Alford attempts to utilize both methods in response to the Department's

motion.

### a.     Direct method

"The direct method of proof permits a plaintiff to show, by way of direct or

circumstantial evidence, that his employer's decision to take an adverse job action

against him was motivated by an impermissible purpose, such as sex."  *Rhodes v. Ill.*

*Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004).  Alford has not presented any

"direct" evidence that he was terminated based on his sex (e.g., a communication from

Johnson to that effect).  He does, however, contend that a "convincing mosaic" of

circumstantial evidence leads to this conclusion.  *Id.*

The Seventh Circuit has identified three categories of such circumstantial

evidence:  (1) "suspicious timing, ambiguous statements oral or written, behavior toward

or comments directed at other employees in the protected group, and other bits and

pieces from which an inference of discriminatory intent might be drawn"; (2) evidence

that similarly situated employees lacking the discriminatory characteristic were treated better; and (3) "evidence that the plaintiff was qualified for the job in question but passed over in favor of (or replaced by) a person not having the forbidden characteristic" and that the employer's reason for the decision is a "mere pretext." *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994). The "circumstantial evidence, however, must point directly to a discriminatory reason for the employer's action." *Rhodes*, 359 F.3d at 504 (quotation omitted). Even circumstantial evidence of bigotry on the part of the decision maker is not enough without this causal link – "there must be a real link between the bigotry and an adverse employment action." *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003).

Alford argues that he has presented all three types of circumstantial evidence. That evidence includes the three remarks allegedly made by Johnson that might indicate animus towards men. It also includes the occasion on which White claims he was punished for making an inappropriate comment to another Department employee but a female employee was not when she engaged in similar conduct. Alford also claims that he and Hawley were treated differently for engaging in similar conduct on the same evening. Last, Alford relies on the fact that he was replaced by a woman, even though his former position is now part-time instead of full-time. Viewed in the aggregate, Alford's evidence is insufficient to create a "mosaic" from which a reasonable jury could find that the Department discriminated against him on the basis of his gender. *See Rhodes*, 359 F.3d at 504.

With respect to the first category of circumstantial evidence, Alford claims that Johnson "routinely made derogatory comments to Alford." Pl.'s Resp. at 5. The

evidence presented, however, consists of only three comments, one in 2004, one in January 2005, and one made no later than August 2005 (as it was made to Dalton). Three isolated comments – all of which occurred well over a year before Alford's termination – would not enable a reasonable jury to find direct evidence of gender discrimination. *Oest v. Ill. Dep't of Corrections*, 240 F.3d 605, 611 ("A long time period between a remark and an adverse employment action can defeat the inference of a causal nexus between the remark and decision to discharge.") (quotation omitted). Moreover, none of the alleged comments by Johnson actually touched on employment matters or Alford's termination. To support a circumstantial case under the direct method, comments by a decision maker must be made "(1) around the time of, and (2) in reference to the adverse employment action complained of." *Gorence v. Eagle Food Ctrs.*, 242 F.3d 759, 762 (7th Cir. 2001) (quotation omitted); *cf. Volvosek v. Wis. Dep't of Agric., Trade & Consumer Prot.*, 344 F.3d 680, 690 (7th Cir. 2003) (finding decision maker's comments were circumstantial evidence of discrimination where comments were "close in time and in substance to the alleged act of discrimination"). Without that connection – of which there is no evidence in this case – Johnson's comments are nothing more than "stray" remarks that do not support Alford's claims. *See Steinhauer v. Degolier*, 359 F.3d 481, 487 (7th Cir. 2004) (holding that "stray" remarks unrelated to an adverse employment action are not sufficient to survive motion for summary judgment).

Alford also claims, in support of his direct evidence argument, that similarly situated employees were treated differently. He points to the incident where he was

disciplined for leaving work early and Hawley was not. This claim fails because Alford and Hawley were not similarly situated, even though shared the same ultimate supervisor, Johnson. A plaintiff relying on circumstantial evidence "must show [she] is similarly situated with respect to performance, qualifications and conduct and that the other employee had engaged in similar conduct without such differentiating or mitigating circumstances." *Walker v. Bd. of Regents of Univ. of Wis. Sys.*, 410 F.3d 387, 396 (7th Cir. 2005) (quotation omitted). No reasonable jury could find Hawley similarly situated to Alford. Hawley was the senior staff member present at the Department on the date in question with authority to send people home early; Alford lacked this authority. And the Department presented evidence that Alford, unlike Hawley, encouraged other employees to leave early that day. Alford was punished for more than leaving early, as he also encouraged others to do so – even if he was only joking – whereas Hawley, who actually had authority to send employees home, did not. Moreover, this incident was not the sole basis for Alford's termination. Alford has not submitted any evidence that Hawley engaged in additional misconduct.

Even if Alford and Hawley were similarly situated, the July 2006 incident still does not support Alford's claim. To support a direct evidence claim, a plaintiff must present evidence that "employees similarly situated to the plaintiff . . . received systematically better treatment." *Troupe*, 20 F.3d at 736. "[A] plaintiff may use pattern evidence of disparate treatment even if that evidence is not rigorously statistical, although, standing alone, it is insufficient to withstand summary judgment." *Smith v. S. Ill. Univ. Edwardsville*, 510 F.3d 772, 782 (7th Cir. 2007) (quotation omitted). The evidence submitted by Alford concerning disparate treatment – which consists of one

incident involving him and one other involving White – would not enable any reasonable jury to conclude that female employees were "systematically" treated better than male employees at the Department.

Alford also claims that he was disciplined for having unsigned treatment plans and female clinicians were not. As noted above, Alford does not identify any particular female clinician that had unsigned treatment plans or whose files would support his claim. Again, this type of unfounded speculation is not sufficient to overcome the Department's motion; indeed, it is inadmissible in evidence. *Oest*, 240 F.3d at 614 (holding that plaintiff's "uncorroborated, conclusory statements that similarly situated co-workers were treated differently" was not sufficient to defeat a motion for summary judgment). Other material that Alford relies on is also inadmissible and thus cannot be used to overcome the Department's motion. White's deposition testimony regarding the allegedly anti-male "spirit of the place" has no foundation. This testimony amounts to nothing more than inadmissible speculation both in the general (his opinion about the atmosphere of the Department) and the specific (why he was not promoted and whether female employees were able to leave work early). "[V]ague reference to a pattern, without any detail" and "mere speculation" are not sufficient to defeat a motion for summary judgment. *Caskey v. Colgate-Palmolive Co.*, 535 F.3d 585, 593-94 (7th Cir. 2008).

Alford also relies on the fact that he was replaced by a woman. This fact is not direct evidence of employment discrimination unless the Department's reasons for Alford's termination were pretextual. *E.g.*, *Troupe*, 20 F.3d 736. The analysis for this determination is "substantially the same" as that required under the *McDonnell Douglas*

burden-shifting method. *Venturelli v. ARC Cmty. Servs., Inc.*, 350 F.3d 592, 601 (7th Cir. 2003). As discussed below, the Department had valid reasons for terminating Alford that no reasonable jury could find pretextual.

To summarize, no reasonable jury could find direct evidence of gender discrimination in this case based on the circumstantial evidence submitted by Alford, regardless of whether that evidence is considered individually or in the aggregate.

### b.    Indirect method

To survive summary judgment under the indirect method, a plaintiff ordinarily must present evidence that (1) he was a member of a protected class; (2) he was meeting the employer's legitimate job expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees outside the protected class were treated more favorably. *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008). If the employee can make this prima facie showing, the burden shifts to the employer to provide a legitimate, non-discriminatory reason for its actions. If it does so, plaintiff bears the burden to submit evidence that defendant's proffered reasons are a pretext – a cover story – for unlawful gender discrimination. *Id.* There is no dispute that Afford suffered an adverse employment action. Summary judgment is appropriate, however, because no reasonable jury could find that Alford has satisfied each element of the burden-shifting test or, even if he had, that the Department's reasons for his termination were not pretextual.

### i.    The Department's legitimate expectations

Under the burden-shifting test, Alford need only produce "some evidence" that

he was meeting the Department's legitimate expectations. *Johnson v. Zema Sys. Corp.*, 170 F.3d 734, 743 (7th Cir. 1999). Alford has met that burden. The relevant question is whether Alford was meeting the Department's legitimate expectations at the time of his termination in October 2006. *E.g.*, *Johal v. Little Lady Foods, Inc.*, 434 F.3d 943, 946 (7th Cir. 2006).

Alford was meeting the Department's expectations in March 2006 according to his performance review. Between March 2006 and October 2006, the Department claims that Alford failed to secure signatures on a number of his treatment plans, left work early, encouraged other employees to leave work early, and fought with his supervisors over fitness for duty evaluations, going so far as to attempt to conduct an evaluation in contravention of Department policy and without the Department's knowledge. Alford does not dispute that he had unsigned treatment plans. He does, however, dispute leaving work early, and the parties disagree whether he was permitted to conduct evaluations on his own time. A reasonable jury could find, based on these facts, that Alford was meeting the Department's legitimate expectations at the time of his termination.

### ii. Protected status

Alford misstates the Seventh Circuit's holding in *Gore v. Indiana University*, 416 F.3d 590 (7th Cir. 2005), when he claims that the first part of the *McDonnell Douglas* test is totally inapplicable in "reverse" discrimination cases like this one. "Rather, the plaintiff in such cases must show background circumstances that demonstrate a particular employer has reason or inclination to discriminate invidiously against whites

15

[or men] or evidence that there is something 'fishy' about the facts at hand." *Id.* at 592 (quotation omitted). No reasonable jury could find such background circumstances in this case. As discussed above, Alford only raises three specific remarks that Johnson allegedly made concerning men, all of which were occurred more than a year before his termination. Alford also has failed to submit evidence that similarly situated female employees received better treatment. There is no evidence of female employees systematically receiving better treatment; rather, Alford's evidence is inadmissible because it is unsupported speculation and theory about the Department. Instead, the undisputed evidence is that Johnson yelled at female employees as well as males, and Alford named a female employee, Estenson, when asked to identify employees he believed were being harassed in the Department.

### iii. Similarly situated employees

The Seventh Circuit has stated that plaintiffs do not face a "hyper-technical" burden of proving that similarly situated employees are "identical" to themselves to satisfy the *McDonnell Douglas* burden-shifting test. *Gates*, 513 F.3d at 690 (emphasis omitted) (citation omitted). As a general rule, however, a plaintiff must at least show that the similarly situated employees "dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct. . . ." *Id.* (quotation omitted). Again, as stated above, Alford does not identify any female clinicians whose treatment plans were similarly deficient. Nor was Hawley similarly situated to Alford with respect to the July 2006 incident. Hawley held a different position, and there is no evidence that she encouraged other employees to go home early. Moreover, Alford has not

presented any evidence of similarly situated employees that attempted to schedule fitness for duty evaluations without the knowledge of the Department or who committed similar infractions and were not terminated. Alford has thus failed to identify a single similarly situated employee.

### iv. The Department's justification and pretext

Even if Alford could meet his burden to establish a prima facie case of indirect discrimination, summary judgment still would be appropriate because no reasonable jury could find that the Department's justification for his termination was pretextual. "The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise or well considered. . . . Pretext is not necessarily established merely when the plaintiff demonstrates the employer's reason was mistaken. An employer's mistaken belief that the plaintiff's conduct merited termination is not unlawful, so long as the belief was honestly held." *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 696 (7th Cir. 2006) (quotation omitted). The Department offers several reasons for Alford's termination. Where a defendant offers multiple reasons for termination, a plaintiff must present evidence that they were all pretextual to defeat a motion for summary judgment. *See Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 754 (7th Cir. 2006); *Mills v. Health Care Serv. Corp.*, 171 F.3d 450, 459 (7th Cir. 1999). Accordingly, even though the Court is not considering the Department's reasons for terminating Alford that occurred before his March 2006 evaluation as explained above, Alford is still required to submit evidence from which a reasonable jury could find pretext for each of the Department's remaining reasons for terminating his employment. "An

employee's attempt to avoid summary judgment cannot succeed unless the employee puts forth evidence suggesting that the employer itself did not believe the proffered reasons for termination." *Burks*, 464 F.3d at 754-55.

Nothing in the record would allow a reasonable jury to find that the Department's reasons for terminating Alford were not honestly held. Alford does not deny that he had a number of unsigned treatment plans in his files. It is also undisputed that Alford attempted to perform services for the Yorkville Police Department outside of and without informing anyone at the Department. It is uncontested that Andrade recommended Alford's termination (even if Johnson made the final decision) and that Johnson made her decision based on that recommendation. Alford has not presented any evidence attributing bias to Andrade. There is no evidence that Johnson and Andrade did not believe that Alford had encouraged other employees to leave work early in July 2006 (whether or not Alford was only joking, as he claims). Alford has failed to present any evidence from which a reasonable jury could find pretext in this case.

**2.     Hostile environment**

Alford alleges in his complaint that the conduct of Johnson and others created a hostile environment at the Department. The Department's motion sought summary judgment on all of Alford's claims. Alford has not addressed the hostile environment issue in response to the Department's motion. Accordingly, the Court considers him to have abandoned that claim. *See Laborers' Int'l Union of N. Am. v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999) (noting that arguments not presented in response to a

summary judgment motion are waived); *Scott-Riley v. Mullins Food Prods., Inc.*, 391 F. Supp. 2d 707, 718 (N.D. Ill. 2005).

### 3.      Retaliation

Like his termination claim, Alford can prove retaliation in violation of Title VII under the direct or indirect methods. *Tomanovich v. Ind. Dep't of Trans.*, 457 F.3d 656, 663 (7th Cir. 2006). Under the direct method, a plaintiff must show (1) participation in a protected activity; (2) an adverse employment action; and (3) a causal connection between them. *Id.* There is no dispute that an adverse employment action occurred.

It is less clear, however, what actions by Alford constitute protected activity. Alford states, in a conclusory manner, that he complained about discriminatory treatment to Andrade. But Alford has submitted no evidence of specific complaints about discrimination to Andrade; rather, he stated in his deposition that he would ask Andrade "what's up with this" and "where is this coming from." Pl.'s Resp. to Def.'s Statement of Facts ¶ 62. To constitute a protected activity a "complaint must indicate the discrimination occurred because of sex. . . . Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient" *Tomanovich*, 457 F.3d at 663. Though Alford claims that he complained to Andrade about "discriminatory treatment" and discipline measures, he has not submitted any evidence that those complaints were linked to his gender. Pl.'s Resp. to Def.'s Statement of Facts ¶¶ 62-63. Without that link, no reasonable jury could find his generalized complaints to constitute protected activity.

Alford's two conversations with Parr suffer from the same problem.  Again, Alford's only evidence is that he complained to Parr about "discrimination" and "harassment"; he does not link his complaints to gender and offers nothing specific regarding their conversations.  Indeed, Alford referenced a female employee, Estenson, when he complained to Parr.  Even if the conversations were a protected activity, they could not support a retaliation claim, because there is no indication that Johnson or anyone else at the Department was aware of them.  *See Salas v. Wis. Dep't of Corrections*, 493 F.3d 913, 924 (7th Cir. 2007) (holding no causal connection to support a retaliation claim where plaintiff failed to produce evidence from which a jury could conclude that the decision maker had knowledge of the alleged protected activity).

The only occasion on which a reasonable jury might find that Alford engaged in protected activity was when he complained to Dalton about Johnson's remarks.  Even then, he connected only some of his complaints to his gender, characterizing the rest in terms of disrespect.  With respect to that activity, Alford's retaliation claim still fails because no reasonable jury could find a causal connection between Alford's complaint to Dalton and his termination.  The only time Alford linked his complaints to Dalton to his gender was following the remark made by Johnson in January 2005, nineteen months before he was terminated.  Thus, there is no temporal proximity between the protected activity and Alford's termination.  *See Tomanovich*, 457 F.3d at 665 (holding four-month span between complaint and adverse action too remote to support a causal connection).  His reliance on *Culver v. Gorman & Co.*, 416 F.3d 540 (7th Cir. 2005), is misplaced.  In that case, summary judgment on a retaliation claim was held erroneous when (1) only seventy-two hours elapsed between plaintiff engaging in a protected

activity and her termination; (2) the termination occurred less than a week after the plaintiff received a good performance review; and (3) the plaintiff was warned against speaking with a supervisor about a raise. *Id.* at 543-44, 546-47. Alford has presented no such evidence linking the complaint made to Dalton to his termination.

Alford also attempts to meet his burden on his retaliation claim through the indirect method. To do so, he must present evidence that (1) he engaged in a protected activity; (2) he was meeting the Department's legitimate expectations; (3) an adverse employment action occurred; and (4) similarly situated employees that did not engage in protected activities were treated more favorably. *Tomanovich*, 457 F.3d at 663. If Alford makes out this prima facie case and the Department offers a non-discriminatory basis for his termination, Alford must submit evidence of pretext. *Id.*

As discussed above, Alford engaged in a protected activity when he spoke to Dalton in January 2005 and suffered an adverse employment action when he was terminated. Alford has not, however, identified a single similarly situated employee that was treated differently than him. Moreover, as discussed above, the Department's reasons for terminating Alford were not pretextual.

**4.      Intentional infliction of emotional distress**

Under Illinois law, a plaintiff claiming IIED must establish "(1) that the defendants' conduct was extreme and outrageous; (2) that the emotional distress suffered by plaintiff was severe; and (3) that defendants' conduct was such that defendants knew that severe emotional distress would be substantially certain to result." *Vickers v. Abbott Labs.*, 308 Ill. App. 3d 393, 410, 719 N.E.2d 1101, 1115 (1999) (affirming

summary judgment on IIED claim).  IIED claims resulting from actions in the

employment context are generally disfavored.  *See id.*  This "reflects a concern that

everyday job stresses should not give rise to a cause of action for" IIED.  *Id.*

Alford has not presented a basis on which any reasonable jury could find that the

Department's conduct was sufficiently extreme and outrageous to support an IIED

claim. Conduct is only actionable where it is "so outrageous in character, and so

extreme in degree, as to go beyond all possible bounds of decency."  *Miller v. Equitable

Life Assurance Soc'y of U.S.*, 181 Ill. App. 3d 954, 956, 537 N.E.2d 887, 888 (1989).  In

*Miller*, the plaintiff failed to allege conduct severe enough to support an IIED action

even though she claimed that she was the victim of sexual harassment and was

subjected to other treatment that was "inconsiderate, rude, vulgar, uncooperative,

unprofessional and unfair."  *Id.* at 957, 537 N.E.2d at 889.  The record in this case only

indicates three arguably biased remarks made over a period of several years, a single

instance on which Alford claims he was treated differently than a female Department

employee, unfounded, generalized complaints about the atmosphere at the

Department, and Alford's termination.  This falls short of the evidence found insufficient

in *Miller*.  No reasonable jury could find that it meets the standard set for an IIED claim.

Accordingly, the Department is entitled to summary judgment on this claim.

## Conclusion

For the foregoing reasons, the Court grants defendant's motion for summary

judgment in [docket no. 33].  The Clerk is directed to enter judgment in favor of the

defendant.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  November 24, 2008